# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF INDIANA
### TERRE HAUTE DIVISION

| | | |
|---|---|---|
| RICKY CROWDER, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 2:14-cv-00202-JMS-MJD |
| | ) | |
| LARIVA, et al., | ) | |
| | ) | |
| Defendants. | ) | |

**Entry Discussing Motion for Summary Judgment**

Ricky Crowder, an inmate at the Federal Correctional Complex in Terre Haute, Indiana ("FCC Terre Haute"), brings this action pursuant to the Religious Freedom Restoration Act ("RFRA") and the theory recognized in *Bivens v. Six Unknown Named Agents,* 403 U.S. 388 (1971). Crowder alleges that his rights were violated when the defendants denied his request for a kosher diet. Crowder seeks declaratory and injunctive relief and monetary damages. The defendants move for summary judgment and Crowder has responded. For the following reasons, the motion for summary judgment [dkt 51] is **granted in part and denied in part**. In addition, and as discussed more fully below, because the facts are undisputed, defendant Jones is directed, pursuant to Rule 56(f) of the *Federal Rules of Civil Procedure*, to show why summary judgment should not be entered in favor of Crowder on his First Amendment and RFRA claims.

## I. Standard of Review

A motion for summary judgment asks that the Court find that a trial based on the uncontroverted and admissible evidence is unnecessary because, as a matter of law, it would conclude in the moving party's favor. *See* Fed. R. Civ. Pro. 56. To survive a motion for summary judgment, the non-moving party must set forth specific, admissible evidence showing that there is

a material issue for trial. Fed. R. Civ. Pro. 56(e); *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986).

Whether a party asserts that a fact is undisputed or genuinely disputed, the party must support the asserted fact by citing to particular parts of the record, including depositions, documents, or affidavits. Fed. R. Civ. Pro. 56(c)(1)(A). A party can also support a fact by showing that the materials cited do not establish the absence or presence of a genuine dispute or that the adverse party cannot produce admissible evidence to support the fact. Fed. R. Civ. P. 56(c)(1)(B). Affidavits or declarations must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant is competent to testify on matters stated. Fed. R. Civ. P. 56(c)(4). Failure to properly support a fact in opposition to a movant's factual assertion can result in the movant's fact being considered undisputed, and potentially the grant of summary judgment. Fed. R. Civ. P. 56(e). The Court need only consider the cited materials, Fed. R. Civ. P. 56(c)(3), and the Seventh Circuit has "repeatedly assured the district courts that they are not required to scour every inch of the record for evidence that is potentially relevant to the summary judgment motion before them," *Johnson v. Cambridge Indus.,* 325 F.3d 892, 898 (7th Cir. 2003).

The defendants object to Crowder's response to the motion for summary judgment arguing that the response fails to comply with Rule 56 and Local Rule 56-1. The Court has considered Crowder's response and agrees that Crowder's response contains some conclusory allegations and irrelevant argument, but the Court will consider verified factual statements that are based on Crowder's personal knowledge and argument that is related to the arguments put forth by the defendants.

2

## II. Undisputed Material Facts

The following statement of undisputed material facts was evaluated pursuant to the standards set forth above. That is, this statement of facts is not necessarily objectively true, but as the summary judgment standard requires, the undisputed facts and the disputed evidence are presented in the light reasonably most favorable to Crowder as the non-moving party with respect to the motion for summary judgment. *See Reeves v. Sanderson Plumbing Products, Inc.,* 530 U.S. 133, 150 (2000).

A. *Policy Regarding Special Diet Requests*

The Bureau of Prisons ("BOP") maintains a national policy statement to guide staff as they attempt to accommodate requested religious practices of the inmates incarcerated within its prisons. Consistent with that effort, the BOP has established a religious dietary program in an effort to meet the religious dietary requirements of the greatest number of religious dietary requirements possible. The BOP's religious diet program, called the Alternative Diet Program ("ADP"), consists of two distinct components: One component provides for religious dietary needs through self-selection from the main line, which includes a no-flesh option and access to the salad/hot bar if one is available. In institutions where meals are served in prepared trays, local procedures will be established for providing the no-flesh component. The other component accommodates dietary needs through nationally recognized, religiously certified processed foods.

BOP policy requires that inmates wishing to participate in the ADP submit in writing an Inmate Request to Staff Member, which is commonly referred to as a "cop out," asking to be enrolled in the program. After receiving this request, the Chaplain will ordinarily conduct an oral interview, referred to as the Religious Diet Interview, and complete the interview form within two

3

working days of the request. The oral interview consists of standardized questions. The Religious Diet Interview is intended to protect the integrity and orderly administration of the ADP and support an efficient food services program. The policy supports the secure and orderly operation of BOP facilities because the interview questions ask the inmate to provide information regarding the underlying religious belief(s) that prompt(s) his/her request for a religious diet while showing that this need is religiously faith-based. The interview questions are thus designed to protect the integrity of the religious diet program by surveying the inmate's belief system and ensuring the request is faith-based and not just a personal preference or lifestyle choice.

The decision to accommodate an inmate's stated religious dietary need is made by a Chaplaincy Team, consisting of two or more chaplains. These chaplains review the interview responses for accurate references to sacred scriptures, passages, or stories; religious traditions that are part of, or related to, the faith the inmate adheres to; given examples of the dietary practices source and a basic understanding of the reasons for the dietary practice; and references to specific religious dietary laws across faith traditions.

The decision as to which component of the religious diet program best accommodates the inmate's religious dietary needs is determined by the inmate's interview responses. Pursuant to the BOP policy, the use of one word describing a religious diet, such as Kosher or Halal, in itself is not enough to warrant placement in the certified component of the ADP. The use of one of these terms must be accompanied with some understanding, albeit basic, of the religious dietary tradition and the reason for needing such accommodation. Inmates are notified of the religious diet component for which they are approved on the Notification of Religious Diet Accommodation

4

(BP-S700), based on their religious dietary needs. If they are unsatisfied with the diet they receive, they may request another accommodation in six months.

The safe, secure, and orderly operation of the FCC Terre Haute includes its food service operations. Management of the certified food menus requires Food Services to plan the purchase of food items and allocate the necessary storage space and staff resources sufficient to effectively meet the demand for the food items and administer the program in a secure and orderly fashion. Food Services staff must order the certified food items in advance so as to have them available when needed. The six-month waiting period required between religious diet interviews supports food services ability to meet the demand for certified food supplies.

B. *Crowder's Religious Diet Requests*

Based upon the BOP's official records, from July 29, 1993, to April 18, 2002, Crowder had expressed no religious preference. From June 22, 2003 to May 2, 2012, Crowder professed to be Protestant. Since May 2, 2012, Crowder has professed adherence to the Messianic-Sabbatarian faith. On April 27, 2012, Chaplain Jones received a cop-out from Crowder, citing the Bible, and requesting a change of religious preference from Protestant to Hebrew Israelite, and to be provided a diet free from pork. Chaplain Jones changed Crowder's religious preference to Messianic, the designation that the BOP uses to denote the Hebrew-Israelite inmates, as soon as he received the request. On May 4, 2012, Crowder presented to the Chapel, and Chaplain Jones conducted the first Religious Diet Interview. The Religious Diet Interview consists of six-standard questions asked of every inmate who seeks to participate in the ADP. Chaplain Jones and Chaplain Wood were the Chaplaincy Team responsible for reviewing Crowder's interview responses, which were as follows:

5

1.       What are your religious dietary needs? Response: I am trying to stay away from pork.

2.       What are the religious reasons for your dietary needs? Response: In the Old Testament, God commands us to stay away from pork.

3.       What does the term "certified processed foods" mean to you? Response: Processed by the government.

4.       If you believe you need to be on the certified processed food line, how do you understand "kosher" or "halal"? Response: Kosher is in the way it is being treated. [There are] no pork byproducts.

5.       Why can't your religious dietary needs be met by self-selecting from the mainline and the salad/hot bar (where the salad/hot bar is part of the Food Service Program)? Response: The way they prepare the food in the kitchen; they are using the same pots and pans as the pork.

6.       Do you understand that you may only purchase and/or consume foods in compliance with your religious dietary laws from the commissary, if you are approved for the certified religious line? Response: yes.

Based on Crowder's responses to the Religious Diet Interview questions, he was provided the option to self-select foods from the mainline, but not provided the certified processed component. The defendants maintain that the decision to place Crowder on the no flesh option was not motivated by any desire to discriminate against him, but was based solely upon his interview responses and discretionary judgments made following BOP policy. On May 5, 2012, Chaplain Jones provided Crowder with Notification of Religious Diet Accommodation informing him that he had been approved to participate in the mainline component of the Religious Diet Program.

On October 26, 2012, Crowder submitted a second cop-out to Chaplain Jones seeking to re-apply to participate in the certified processed food component of the ADP. On October 27, 2012, Chaplain Jones instructed Crowder to see him for an interview with a copy of the cop-out.

6

On November 2, 2012, Chaplain Jones conducted a second Religious Diet Interview. Crowder provided the following responses to the second interview:

1.   What are your religious dietary needs? Response: Pork free. Kosher food.

2.   What are the religious reasons for your dietary needs? Response: some foods are unclean. Pork is unclean.

3.   What does the term "certified processed foods" mean to you? Response: Mechanically separated.

4.   If you believe you need to be on the certified processed food line, how do you understand "kosher" or "halal"? Response: Kosher is properly prepared foods.

5.   Why can't your religious dietary needs be met by self-selecting from the mainline and the salad/hot bar (where the salad/hot bar is part of the Food Service Program)? Response: They use the same utensils and pots and pans when they prepare pork meals.

6.   Do you understand that you may only purchase and/or consume foods in compliance with your religious dietary laws from the commissary, if you are approved for the certified religious line? Response: yes.

Chaplains Jones and Woods reviewed the interview responses, and determined that the self-select component of the ADP was most appropriate to accommodate Crowder's religious dietary needs. The defendants maintain that the decision to place Crowder on the no flesh option was not motivated by any desire to discriminate against the Crowder, but was based solely upon Crowder's interview responses. On November 3, 2012, Chaplain Jones provided Crowder with the Notification advising him of the decision as required by policy.

7

On May 19, 2013, Crowder submitted a third cop-out to Chaplain Jones requesting to participate in the certified processed food component of the religious diet program. Crowder was interviewed on May 24, 2013, and provided the following responses:

1. What are your religious dietary needs? Response: To eliminate pork from my diet.

2. What are the religious reasons for your dietary needs? Response: From what I have been reading in Genesis, we should abstain from certain foods

3. What does the term "certified processed foods" mean to you? Response: Mechanically processed under Jewish law.

4. If you believe you need to be on the certified processed food line, how do you understand "kosher" or "halal"? Response: Kosher means foods processed according to Jewish law.

5. Why can't your religious dietary needs be met by self-selecting from the mainline and the salad/hot bar (where the salad/hot bar is part of the Food Service Program)? Response: They use the same utensils as what they use when they cook with pork.

6. Do you understand that you may only purchase and/or consume foods in compliance with your religious dietary laws from the commissary, if you are approved for the certified religious line? Response: yes.

Chaplain Jones reviewed the interview responses, but does not recall which other Chaplain(s) participated as part of the Chaplaincy team.

It was each of their discretionary judgment that the self-select component of the ADP was most appropriate to accommodate Crowder's religious dietary needs. On May 26, 2013, Chaplain Jones provided Crowder with Notification advising him that he had been approved to participate in the mainline component of the Religious Diet Program, which includes access to the salad/hot bar only (where the salad/hot bar is part of the Food Service Program.). When Crowder questioned

8

the consistent denial of is religious diet requests, he was told that there are no right or wrong answers.

On April 2, 2015, Chaplain Thomas conducted a fourth Religious Diet Interview of Crowder. Crowder's interview responses to the fourth interview were the following:

1.  What are your religious dietary needs? Response: No pork, no pork products, no contact with unclean meat, especially. Pots, pans, trays and utensils often have residue from the previous meals and are therefore unclean. No need for separation of dairy with meat, but I don't drink milk or eat cheese. Proper draining of blood on slaughtered animals is needed.

2.  What are the religious reasons for your dietary needs? Response: Cow milk is for a cow. I am human and I don't drink cow milk. I need this diet to be obedient to the commands of the Father, Yaweh. These commands are in Genesis, Leviticus, and Deuteronomy. Obedience brings perfection and will bring you closer to the Creator.

3.  What does the term "certified processed foods" mean to you? Response: It is prepared different from the normal meats. It has been inspected and handled a certain way.

4.  If you believe you need to be on the certified processed food line, how do you understand "kosher" or "halal"? Response: A religious authority makes certain that the food is handled, processed in a manner consistent with religious dietary laws. Slaughtering is done in a manner much different from a regular packing house.

5.  Why can't your religious dietary needs be met by self-selecting from the mainline and the salad/hot bar (where the salad/hot bar is part of the Food Service Program)? Response: The food on the trays has come into contact with pork, pork products and trays, pots, pans, utensils that are ritually unclean. Foods are not cooked, slaughtered correctly and may therefore retain blood against my religious tradition.

6.  Do you understand that you may only purchase and/or consume foods in compliance with your religious dietary laws from the commissary, if you are approved for the certified religious line? Response: yes.

9

On April 3, 2015, Chaplain Thomas provided Crowder with the Notification providing him access to the certified processed food alternative.

Warden Oliver responded in his supervisory role to Crowder's administrative remedy request stating that chaplaincy staff followed BOP policies and procedures in processing the requests and Religious Diet Interview, but was not directly or personally involved in any of the decisions related to Crowder's religious diet accommodations. Warden LaRiva was not the Warden at FCI Terre Haute, Indiana, for the times relevant to the Amended Complaint, and she did not directly participate in any decisions related to Crowder's requests for religious food accommodations. Chaplain Holston, as the supervisory Chaplain at FCC Terre Haute, while hearing some of the Chaplaincy team discussions, was not directly or personally involved in any of the decisions regarding Crowder's placement on a religious diet program.

### III. Discussion

In his Amended Complaint, Crowder alleges that defendants Warden Oliver, Warden LaRiva, Chaplain Holston, and Chaplain Jones, burdened his religious exercise and practices by denying him a kosher diet in violation of the provisions of the First Amendment and RFRA. The defendants move for summary judgment. Defendants LaRiva, Oliver, and Holston argue that they cannot be held liable for the alleged violations because they were not personally involved in the decision to deny Crowder his requested religious diet. The defendants also seek summary judgment arguing that Crowder's RFRA claims are moot, that he did not violate his rights, and that he is entitled to qualified immunity.

A. *Personal Responsibility*

Defendants Oliver, LaRiva, and Holston argue that even if Crowder's right to practice his religion was violated, the claims against them must be dismissed because they were not personally involved in the alleged violations.

A defendant can only be liable for the actions or omissions in which he personally participated. *Sanville v. McCaughtry*, 266 F.3d 724, 734 (7th Cir. 2001); *Ashcroft v. Iqbal*, 556 U.S. 662, 676 (2009); *Patel v. Bureau of Prisons*, 125 F.Supp.3d 44, 55 (D.D.C. 2015) ("[P]ure vicarious liability . . . . is not sufficient to state a claim under RFRA.").

The evidence shows that Warden LaRiva was not the Warden at FCC Terre Haute when Crowder made his religious dietary requests. Crowder's Religious Diet Interviews occurred in May of 2012, October of 2012, and May of 2013. LaRiva arrived at FCC Terre Haute on November 3, 2013. Regardless of whether Crowder approached LaRiva after her arrival at FCC Terre Haute regarding his requests for a kosher diet, he has presented no evidence that she participated in the decision-making process or the denial of the requested diet.

Defendants Oliver and Holston have also shown that they did not personally participate in the alleged denial of Crowder's requested diet. While Crowder may briefly have complained to them regarding his religious diet requests, these defendants have shown that they did not personally deny Crowder's requests for a kosher diet. *See George*, 507 F.3d at 609 ("Ruling against a prisoner on an administrative complaint does not cause or contribute to the violation."). Crowder has also presented no evidence that defendants Oliver and Holston personally participated in the decision to deny him his requested diet.

11

Because defendants LaRiva, Holston, and Oliver have shown that they did not personally participate in the actions at issue, they are entitled to summary judgment and the claims against them will be dismissed.

B. *Mootness*

The only remaining defendant is Chaplain Jones. Jones argues that Crowder's RFRA claims are moot. First, he asserts that Crowder's claims are moot because he is now receiving the kosher meals that he requested. He also argues that Crowder is not entitled to any monetary damages because RFRA does not authorize money damages against individual defendants either in their official or individual capacities.

1. *Current Provision of the Requested Diet*

Jones argues that because Crowder is now receiving the kosher diet as requested, no injunctive relief is necessary and his request for such relief is moot. But it is well-established that a defendant's voluntary cessation of a challenged practice does not necessarily moot a case. *Vincent v. City Colleges of Chicago,* 485 F.3d 919, 925 (7th Cir. 2007). Instead, the question is "whether the complained-of conduct may be resumed." *Id.*; *see also Borkholder v. Lemmon*, 983 F. Supp. 2d 1013, 1017 (N.D. Ind. 2013). "[T]he burden of proving that the behavior cannot be reasonably expected to recur is a 'heavy' one that lies with the party seeking a determination that the case is moot." *Doe ex rel. Doe v. Elmbrook Sch. Dist.*, 658 F.3d 710, 719 (7th Cir. 2011). Here, Jones has not shown or argued that the complained-of behavior might not resume. Accordingly, he has not met his burden of showing that Crowder's claims for injunctive relief are moot.

### 2. *Monetary Damages*

Jones also argues that Crowder cannot recover monetary damages under RFRA because the United States has not waived its sovereign immunity from monetary damages under RFRA against a defendant in his or her official or individual capacity. RFRA provides: "A person whose religious exercise has been burdened in violation of this section may assert that violation as a claim or defense in a judicial proceeding and *obtain appropriate relief* against a government." 42 U.S.C. 2000bb-1 (emphasis added).

Jones first argues that "appropriate relief" does not include monetary damages against the United States and therefore does not permit recovery of damages against a person in his or her official capacity. According to Jones, RFRA's reference to "appropriate relief" is not the "sort of unequivocal waiver" necessary to waive sovereign immunity. *Webman v. Fed. Bureau of Prisons*, 441 F.3d 1022, 1026 (D.C. Cir. 2006). Because "appropriate relief" is not unequivocal and because the Supreme Court has held that similar language in the Religious Land Use and Institutionalized Persons Act ("RLUIPA") did not waive a state's sovereign immunity from monetary damages, *see Sossamon v. Texas*, 563 U.S. 277, 287 (2011), the Court agrees that RFRA does not waive the United States' sovereign immunity from monetary damages. Therefore, Crowder cannot recover monetary damages from Jones in his official capacity.

Jones goes on to argue that RFRA does not authorize monetary damages against him in his individual capacity. Jones reasons that:

> [I]t is untenable to conclude that Congress would have wanted to require government officials, following official governmental policy as they are required to do, but sued in their individual capacities should pay for violations of the statute out of their own pocketbooks when similar monetary relief is unavailable against the government.

In other words, according to Jones, if a defendant official follows a government policy, that government official should not be held liable for a constitutional violation to a greater extent than the government that issued the policy. But this argument assumes that there is no discretion inherent in the government policy and that application of the policy by an official will always require the same result. That is not the case here. Here, the BOP's ADP was interpreted and implemented by individuals using their judgment based on Crowder's interview responses. The individual defendants themselves say as much in their statement of facts, explaining that it was each of their discretionary judgment that the self-select component of the ADP was most appropriate to accommodate Crowder's requests. Because the BOP policy requires implementation based on discretionary decisions, a decision that the United States is immune from monetary damages does not necessarily compel a conclusion that the Jones is similarly immune.

Jones also argues that because the Seventh Circuit in *Nelson v. Miller*, 570 F.3d 868, 887 (7th Cir. 2009), held that the similarly-worded RLUIPA does not allow for the collection of money damages against individuals, the same reasoning should apply to RFRA. But there are at least two important differences between RLUIPA and RFRA that compel a different conclusion. First, as explained by District Court for the District of Columbia in *Patel v. Bureau of Prisons*, 125 F.Supp.3d 44 (D.D.C. 2015), the statutory language of RFRA defines "government" as, among other things, an "official (or other person acting under color of law)." According to the *Patel* court, "[b]y authorizing suits against 'persons' who are not 'officials,' Congress thus envisioned at least some individual-capacity suits under RFRA. *Id.* at 50. Second, RFRA, which applies to federal action, and RLUIPA, which is applicable to state action, arise from different principles. As the *Patel* court pointed out, the portion of RFRA that authorizes lawsuits against the states was held

14

unconstitutional because such an application exceeded Congress's power under the Enforcement Clause of the Fourteenth Amendment in *City of Boerne v. Flores*, 521 U.S. 507, 536 (1997). The court explained that RLUIPA was enacted in response to *City of Boerne* and reasoned that "because RLUIPA was enacted as an exercise of Congress's spending power, interpreting that statute to allow damages actions against state officials in their individual capacities would 'raise serious questions regarding whether Congress had exceeded its [constitutional] authority.'" *Id.* This is because the application of restrictions created pursuant to the Spending Clause to people other than the recipients of federal funds would bind non-parties to the spending "contract." *Id.* (quoting *Nelson*, 570 F.3d at 889). According to the court in *Patel*, such considerations are not at issue when applying RFRA because RFRA's application to federal action is not based on the Spending Clause. *Id.* Other courts have reached similar conclusions. *See Rezaq v. Federal Bureau of Prisons*, 2016 WL 97763 (S.D. Ill. January 8, 2016) (finding that RFRA permits individual money suits). For these reasons, the Court concludes that RFRA does allow for the recovery of monetary damages against officers in their individual capacities.

In short, Jones is not entitled to summary judgment on the grounds that Crowder's claims for injunctive relief are moot or monetary damages under RFRA are unavailable.

C. *Qualified Immunity*

Jones also argues that even if he is found to have violated Crowder's rights under RFRA or the First Amendment, he is entitled to qualified immunity against Crowder's claims. "Qualified immunity protects officers performing discretionary functions from civil liability so long as their conduct does not violate *clearly established* statutory or constitutional rights that a reasonable person would know about." *Mustafa v. City of Chicago*, 442 F.3d 544, 548 (7th Cir. 2006) (citing

*Saucier v. Katz,* 533 U.S. 194, 201 (2001)). Analysis of the qualified immunity defense requires a consideration of: (1) whether the plaintiff's constitutional rights were violated and (2) whether the right clearly established at the time. *Id.* These questions can be addressed in order here.

### 1. Violation of Crowder's Rights

Crowder alleges that because his requests for a kosher diet were continuously denied, his rights under RFRA and the First Amendment were violated. Both RFRA and the Free Exercise Clause of the First Amendment consider whether a person's right to exercise his religion was substantially burdened. If a substantial burden is found, the First Amendment and RFRA apply different tests to determine if the burden resulted in the violation of the person's rights.

### a. Substantial Burden

Claims under both RFRA and the First Amendment are evaluated under the substantial burden test, which requires the plaintiff to show that the defendants substantially burdened his free exercise rights. *See Patel v. Bureau of Prisons,* 515 F.3d 807, 814 (8th Cir. 2008) ("[T]he same definition of 'substantial burden' applies under the Free Exercise Clause, RFRA, and RLUIPA."). "[A] substantial burden on the free exercise of religion . . . is one that forces adherents of a religion to refrain from religiously motivated conduct, inhibits or constrains conduct or expression that manifests a central tenet of a person's religious beliefs, or compels conduct or expression that is contrary to those beliefs." *Koger v. Bryan,* 523 F.3d 789, 798 (7th Cir. 2008) (internal quotation and citation omitted); *see also Burwell v. Hobby Lobby Stores, Inc.*, 134 S.Ct. 2751, 2775 (2014); *Thomas v. Review Bd. of Ind. Employment Sec. Div.,* 450 U.S. 707, 718 (1981). It is not for the Court to determine whether the plaintiff's "religious beliefs are mistaken or insubstantial[; i]nstead, our narrow function in this context is to determine whether the line drawn reflects an

honest conviction." *Hobby Lobby*, 134 S. Ct. at 2779 "[A] prisoner's religious dietary practice is substantially burdened when the prison forces him to choose between his religious practice and adequate nutrition." *Nelson v. Miller*, 570 F.3d 868, 879 (7th Cir. 2009).

Jones argues that Crowder's religious rights were not substantially burdened because his religious diet requests were accommodated. But the record before the Court belies this conclusion. Crowder submitted four separate religious diet requests before he received a kosher diet. Jones describes Crowder's first three interview responses as merely expressing an aversion to pork. But Crowder's responses were more specific than that. In each request, Crowder indicated that he sought not only meals that were pork-free, but kosher meals and meals that were not prepared with the same cookware as those used to prepare pork.[1] Crowder also explained in each request that the self-select option would not satisfy his needs. For example, in his first interview, in response to the question "Why can't your religious dietary needs be met by self-selecting from the mainline and the salad/hot bar (where the salad/hot bar is part of the Food Service Program)?", Crowder answered, "The way they prepare the food in the kitchen; they are using the same pots and pans as the pork." In his second interview, Crowder stated: "They use the same utensils and pots and pans when they prepare pork meals." And in the third, he responded: "They use the same utensils as when they cook with pork." Despite these answers, after his first three interviews, Crowder was directed to the self-select option. There is no evidence in the record that would create a reasonable inference that the food from the self-select option would satisfy Crowder's request for food not

---

[1] Jones does not argue or otherwise assert that the washing of the cookware and utensils daily sufficed to make those items kosher or otherwise should satisfy Crowder's asserted religious requirement that his food not be prepared with cookware used to prepare pork. The record indicates the contrary, in fact, because Crowder continued to request meals prepared with utensils not used to prepare pork.

prepared with the same cookware as that used to cook pork. In addition, Crowder referenced religion or religious texts in each of his requests. There is no evidence that Crowder's religious diet requests were not based on a religious belief and Jones does not contend as much.

In short, when he was denied his request for certified, processed foods and instead directed to self-select from the mainline, Crowder was pressured to modify his behavior in violation of his religious beliefs. This conclusion is bolstered by the fact that Crowder continued to request a kosher diet until he was authorized to receive that diet. The Court concludes therefore that Jones substantially burdened Crowder's religious practice.

### b. First Amendment

Jones argues that even if Crowder's religious practice was substantially burdened, this burden did not violate Crowder's First Amendment rights. Under the First Amendment, in the prison setting, any restriction on an inmate's ability to practice his religion need only be "reasonably related to legitimate penological interests." *Turner v. Safley*, 482 U.S. 78, 89 (1987).[2] While the courts must defer to prison officials' policy-making expertise, the reasonableness of their regulation depends on (1) whether there is a valid, rational connection to a legitimate governmental objective; (2) whether there are alternative means of exercising the right that remain open to the inmate, (3) the impact an accommodation of the asserted right would have on the

---

[2] Outside the prison context, the First Amendment analysis is governed by *Employment Div. v. Smith*, 494 U.S. 872 (1990), which holds that the free-exercise clause does not require accommodation of religious practices, and that identical treatment of believers and non-believers satisfied the First Amendment. The Seventh Circuit has noted the tension between *Smith* and *Turner*, but declined to resolve it, because the *Smith* analysis was not argued, see *Vinning-El v. Evans*, 657 F.3d 591, 593 (7th Cir. 2011), and this Court does the same here.

18

guards and other inmates, and (4) whether there are obvious alternatives to the restriction. *Ortiz v. Downey*, 561 F.3d 664, 669 (7th Cir. 2009). Each of those factors is discussed below:

*Connection to a Legitimate Government Objective*

In undertaking the First Amendment analysis, Jones again bases his argument on the assumption that Crowder's religious requests were met through application of the ADP. Jones then goes on to argue that the ADP has a valid and rational connection with the interest in a safe, orderly, and cost-effective operation of the prison. This argument does not reach the heart of the issue here, which is whether the application of the ADP to Crowder was valid when his repeated requests for a diet free of food prepared with the same cookware used to prepare pork were denied.

Jones also argues that the Religious Diet Interview prevents fraud by requiring inmates to state the religious reasons for wanting a religious diet. This requirement, according Jones, prevents an inmate from changing his religious diet preferences just to get a benefit. The time delays between interviews, Jones asserts, allow chaplains to process religious diet requests consistently and timely. In addition, Jones argues that by limiting the provision of a religious diet to inmates who have satisfied the requirements of the ADP, the BOP realizes significant cost savings and provides equitable opportunities for each inmate to exercise his religious beliefs. All of these factors may be compelling government interests. But Crowder's challenge is not to the ADP generally, but to the application of that policy to his specific requests. Whether or not the ADP is a constitutionally adequate mechanism for deciding religious diet requests has no relevance to whether when making a specific determination about Crowder's requests, Jones violated the First Amendment. He therefore cannot hide behind an arguably constitutional policy to defend an unconstitutional implementation of that policy.

There is no evidence or argument that Crowder changed his religious diet requests just to get some sort of unidentified benefit. There is also no evidence that Crowder's requests were insincere. Importantly, as has been discussed, although he alludes to such reasoning, Jones does not earnestly argue that Crowder's requests were insincere. Instead, Jones argues that Crowder received the diet he requested based on his Religious Diet Interview answers. But this argument has already been rejected because Crowder's Religious Diet Interview answers specified that the self-select option would not satisfy his religious needs and provided an explanation. Jones's suggestion that provision of the kosher diet was permissible only when Crowder, on his fourth attempt at the Religious Diet Interview, provided more detailed answers is unavailing because Crowder consistently and specifically requested a diet prepared with separate utensils than those used to prepare pork and stated that his requests were based on his religious beliefs.

Jones has not shown that the denial of Crowder's requested diet, after he submitted to the Religious Diet Interview, satisfied any compelling government interest. In these circumstances, the Court cannot find that the application of the Religious Diet Interview to Crowder had a rational connection to a legitimate government objective.

### *Alternative Means of Exercising the Right*

Jones goes on to argue that Crowder was permitted alternative means of religious expression, including religious dietary accommodations for Passover and the Seder, Friday night Hebrew Israelite service, access to religious books and other media, religious oils, religious study time, and permission to wear a yarmulke. Because it is undisputed that Crowder was afforded other means of expressing his religion, this factor weighs in favor of a conclusion that the application of

the religious diet policy was not unreasonable. *See DeHart v. Horn*, 227 F.3d 47, 57 (7th Cir. 2000).

### *Impact of an Accommodation*

Jones further argues that the absence of an ADP would have a detrimental impact on the orderly operation of the ADP. Again, this argument misses the core of Crowder's claims – that the application of the Religious Diet Interview to him violated his rights. As Jones explains, the chaplains review the interview responses for a basic understanding of the reasons for the dietary practice, among other things. To the extent Jones argues that Crowder's responses to the interview questions in the first three interviews did not indicate a need for a diet prepared with cookware not used to prepare pork or sufficient reasons for this request, he misrepresents content of Crowder's answers. In fact, Crowder indicated specifically the preparation requirements for the diet he requested and identified that the request was based on his religious beliefs.

### *Obvious Alternatives*

Finally, Jones argues that there are no obvious alternatives to the ADP that would satisfy the need to manage the religious diet program in an orderly and efficient manner. Jones explains that once Crowder properly and fully clarified his religious diet needs, he was provided with the kosher diet. Once again, Jones fails to reach the crux of the issue—whether there was any obvious alternative to the three denials of Crowder's religious diet requests. Here, the obvious alternative would have been to grant the request when Crowder submitted to the Religious Diet Interview and specified his need for a kosher diet.

The four factors of *Turner* discussed above contemplate a judgment by the court regarding the reasonableness of the defendant's conduct under all of the circumstances reflected in the

record. *DeHart v. Horn*, 227 F.3d 47, 59 (3d Cir. 2000). An evaluation of the *Turner* factors here compels the conclusion that Jones's conduct was not reasonable in these circumstances. While Crowder did have alternative means of expressing his religion, his right to a kosher diet, which other inmates were provided, was denied for an extended period of time. Jones has not provided sufficient justification based on the other factors of *Turner* for this denial. Accordingly, the Court finds that Crowder's First Amendment rights were violated.

c. RFRA

Jones argues that for the same reasons that Crowder's First Amendment rights were not violated, his RFRA rights were also not violated. But as discussed above, the Court finds that Crowder's First Amendment rights were violated. RFRA provides that "[g]overnment shall not substantially burden a person's exercise of religion even if the burden results from a rule of 'general applicability' unless the application of the burden to the person (1) is in furtherance of a compelling governmental interest; and (2) is the least restrictive means of furthering that interest." 42 U.S.C. § 2000bb-1. In conducting the First Amendment analysis, the Court has already found that the application of ADP to Crowder was not reasonably related to a legitimate government objective. For the same reasons, it cannot be found to have satisfied the more exacting RFRA standard. *See Holt v. Hobbs*, 135 S. Ct. 853, 863 (2015) (quoting *Hobby Lobby*, 134 S. Ct. at 2779) (RFRA contemplates a "'more focused inquiry'" than just a compelling interest in prison safety and security, requiring the defendant "to demonstrate that the compelling interest test is satisfied through application of the challenged law 'to the person'—the particular claimant whose sincere exercise of religion is being substantially burdened.").

22

In short, the Court cannot conclude, as Jones argues, that Crowder received what he requested or that the denial of his requests was justified under the First Amendment or RFRA. In fact, the evidence shows that Crowder's right to receive a diet that satisfies the requirements of his religion was violated.

### 2. Clearly Established Right

Jones argues that even if the Court finds that he violated Crowder's rights, he is entitled to qualified immunity because there is no clearly established right to a kosher diet without going through the ADP and that requiring an inmate to submit a standard application to receive kosher meals is not unconstitutional. Based on this, he argues that "The qualified immunity inquiry could be framed as whether a reasonable officer would have known that an inmate has a right to a religious diet of his choice without going through institutional procedures."

Jones misperceives the qualified immunity analysis here. He apparently assumes that as long as an individual official followed an established BOP policy that has not generally been found to be illegal or unconstitutional, the individual necessarily could not have violated clearly established law. But this analysis places too much weight on the existence of a policy and not enough weight on the individual official's discretion in applying policy. To follow Jones's reasoning, a defendant official could shield him or herself from liability when applying a clearly unconstitutional policy as long as the policy had not yet been held to be unconstitutional. A defendant could also be immune when applying a constitutional policy in a clearly unconstitutional manner. This is not the proper analysis. The proper question, as discussed above, is whether when Crowder's rights to a kosher diet when requested based upon his religious beliefs was clearly established. There is no doubt that it was. To be a clearly established right, "existing precedent

must have placed the statutory or constitutional question beyond debate." *Ashcroft v. al-Kidd*, 131 S.Ct. 2074, 2083 (2011). "The salient question is whether the law at the time of the disputed conduct gave defendants fair warning that their alleged treatment of plaintiff was unconstitutional." *Michael v. Cresbach*, 526 F.3d 1008, 1017 (7th Cir. 2008). Here, at the time of Crowder's religious diet requests, the law was clear that the denial of a prisoner's request for a diet based on his sincerely held religious beliefs violated that inmate's rights. *See Koger v. Bryan*, 523 F.3d 789, 797 (7th Cir. 2008) (rejecting qualified immunity defense when prison official denied plaintiff's religious dietary request); *Vinning-El v. Evans*, 657 F.3d 591, 595 (7th Cir. 2011) (denial of prisoner's requests for a particular diet based on his sincerely held religious beliefs violated RLUIPA). Other courts in this Circuit have reached the same conclusion. *See Oliver v. Harner*, 2016 WL 1117084 (S.D. Ill. Mar. 22, 2016) (denying qualified immunity on First Amendment and RLUIPA claim where chaplain did not show that the denial of the requested religious diet was based on a reasonable determination of the sincerity of the request).

Jones quotes case law stating that prison officials are entitled to consider the sincerity of a prisoner's request, but he does not argue or cite to evidence that Crowder's first three requests were not based on his sincere religious beliefs. And, in any event, the fact that Crowder's religious preferences were accommodated in other ways supports instead of undermines the sincerity of his beliefs. His religion preference was changed from Protestant to Hebrew Israelite on his first request, he was given access to Friday night religious services, Seder meal, yarmulkes, and religious materials. Moreover, Crowder has since been given the religious diet he requested all along. These facts suggest that Jones did not doubt, and should not have doubted, the sincerity of the requests. *See Koger*, 523 F.3d at 797 (finding that the plaintiff's reference to religious tenets

in requesting a religious diet and continuing his request over a substantial period of time demonstrated that his beliefs were sincerely held); *Oliver*, 2016 WL 1117084 ("'the duration of time' over which Plaintiff sought to have his request for a kosher diet accommodated is evidence that his beliefs were sincerely held.").

For these reasons, the Court finds that Jones violated Crowder's clearly established rights. He is therefore not entitled to qualified immunity. For the same reasons, Jones is not entitled to summary judgment on the merits of Crowder's claims.

### IV. Conclusion

For the foregoing reasons, the defendants' motion for summary judgment [dkt 51] is **granted in part and denied in part**.

The motion is **granted** as to the claims against defendants LaRiva, Holston, and Oliver because those defendants have shown they had no personal involvement in any of the alleged actions. All claims against LaRiva, Holston, and Oliver are **dismissed**. The motion is also **granted** to the extent that no monetary damages may be awarded against any individual defendant in his or her official capacity under RFRA.

The motion for summary judgment is in all other respects **denied:**

First, the request that Crowder's claims for injunctive relief be dismissed as moot is **denied** because Jones failed to carry his burden to demonstrate the conduct at issue cannot be repeated. Because the claims against all defendants except Jones have been dismissed, Crowder's claim for injunctive relief shall proceed against Jones in his official capacity.

Next, the request for dismissal of Crowder's claims for monetary damages under RFRA against defendant Jones in his individual capacity is **denied**.

Finally, the request for dismissal of Crowder's claims under the First Amendment and RFRA is **denied** because Jones has failed to show that as a matter of law that Crowder's rights were not violated. In fact, the contrary is true. As explained above, the facts before the Court are largely undisputed: Crowder submitted a number of requests to receive a kosher diet. Crowder explained in those requests that, based on his religious beliefs, he required meals prepared with cookware different than that used to prepare pork. Those requests were repeatedly denied. These denials resulted in a substantial and unjustified burden on Crowder's rights under the First Amendment and RFRA. Based on these conclusions, and pursuant to Rule 56(f) of the *Federal Rules of Civil Procedure*, **Jones shall have through October 4, 2016, to show why summary judgment should not be entered in favor of Crowder and against Jones as to Jones's liability to Crowder on his First Amendment and RFRA claims. To do so, Jones must identify specific issues of fact which preclude summary judgment and necessitate a trial on Crowder's claims**.

In addition, also based on the conclusions identified above, the Court finds that Crowder is entitled to relief in the form of an injunction prohibiting any requirement that Crowder submit in the future to a Religious Diet Interview, unless he changes his religious preference, and prohibiting the denial to him of the requested kosher diet. The parties shall have **through October 4, 2016**, to submit proposed language for this injunction.

**IT IS SO ORDERED.**


Date: <u>September 12, 2016</u>

Hon. Jane Magnus-Stinson, Judge
United States District Court
Southern District of Indiana

26

Distribution:

Ricky Crowder
15807-039
Terre Haute FCI
P.O. Box 33
Terre Haute, IN 47808

All electronically registered counsel